ELIZABETH CAMPBELL v. EMIL NELSON AND ANOTHER.[1]

June 29, 1928.

No. 26,627.

**When findings of industrial commission should be sustained.**

1(a)   The findings of the industrial commission must remain undisturbed if there is evidence reasonably tending to sustain them or unless they are manifestly and clearly contrary to the evidence.

(b)   If reasonable minds might reach opposite conclusions after a fair consideration of all the evidence and the proper inferences to be drawn therefrom, then a reasonable conclusion arrived at by the commission must be adhered to.

(c)   The commission is not necessarily concluded by undisputed testimony, but it must assume as true the positive, unimpeached testimony of credible witnesses unless the same is inherently improbable or rendered so by facts and circumstances disclosed at the hearing. If such testimony is improbable or contains so many contradictions as to furnish substantial reasons for believing it to be false, such testimony may be disregarded.

**Conclusion sustained that there was no common law marriage.**

2.   Under the evidence in this case, the commission was warranted in reaching the conclusion that the claimed common law marriage did not exist.

[1]Reported in 220 N. W. 401.

**Divorce procured by husband not proved.**

3. In the absence of satisfactory proof that a valid first marriage had been terminated by death or divorce, a statement by relator that she had heard from some unnamed source that her first husband had secured a divorce and married again is not sufficient to establish the same as a fact, particularly under the circumstances in this case. Where one spouse deserts the other and goes to parts unknown and makes no effort to ascertain whether the deserted one is dead or alive, the presumption as to death on account of absence does not obtain.

**Relator not entitled to compensation for death of alleged husband.**

4. Tested by the proper rules, the evidence in this case requires an affirmance of the order of the commission.

Death, 17 C. J. p. 1171 n. 49.

Marriage, 38 C. J. p. 1338 n. 59; p. 1342 n. 80.

Workmen's Compensation Acts—C. J. p. 116 n. 43; p. 122 n. 40; p. 123 n. 42.

---

See note in L. R. A. 1916A, 178, 266; L. R. A. 1917D, 188; 30 A. L. R. 1277; 28 R. C. L. 228, 829; 3 R. C. L. Supp. 1600; 4 R. C. L. Supp. 1872; 5 R. C. L. Supp. 1581; 7 R. C. L. Supp. 1011.

Certiorari to review an order of the industrial commission denying compensation to relator for the death of Arthur O. Campbell while in the employ of defendant Emil Nelson, doing business as Peerless Laundry. Affirmed.

*Leo J. Seifert,* for relator.

*G. P. Mahoney,* for respondent employer and United States Casualty Company, his insurer.

HILTON, J.

Certiorari to review an order of the industrial commission denying petition of relator, Elizabeth Campbell, for compensation because of the death of Arthur O. Campbell.

Decedent, by occupation a steeple-jack, while engaged in painting a smokestack at Fairmont, Minnesota, on November 6, 1926, fell about 70 feet to the ground and was instantly killed. Decedent and relator had been for more than six years residents of Omaha, Nebraska, and neither had ever resided in the state of Minnesota.

The referee found, and the commission by its order approved the findings, that the accident which resulted in death arose out of and in the course of decedent's employment and that on the date thereof relator was not the lawful wife of Arthur O. Campbell, deceased. The only question here involved is as to the correctness of the latter finding.

Relator testified that in Omaha, Nebraska, she and decedent became engaged and agreed to be married; that they drove to Kansas City, Missouri, for that purpose on October 17, 1922, and were there married on that day by a justice of the peace named Flynn, upon a license duly issued; that they lived together in Omaha as husband and wife until his death. There was other evidence to the effect that they had been apparently living together as husband and wife and that each had stated to others that they were such. Relator testified that Campbell secured the license in Kansas City, but she afterwards stated that she gave her own name in getting the marriage license. She further testified that she had the marriage certificate in Omaha in her trunk and would produce it, but gave as a reason for failing later to produce it that it had been stolen from their car.

At Fairmont, Minnesota, on April 13, 1927, at the hearing before the referee, relator, while being examined by her own attorney, testified to the claimed Kansas City marriage and then as follows: Q. "Had you been previously married?" A. "No, sir." Q. "You had never been married prior to that time?" A. "No, sir." On May 19, 1927, in a deposition, after again testifying to the claimed Kansas City marriage, she testified as follows: Q. "You had never been married before?" A. "No, sir." Q. "You weren't a widow or divorced?" A. "I was single." The facts, later developed, conclusively showed that she was married in Windsor, Ontario, to one Wilkinson in 1898; that a ceremonial marriage was entered into in 1910 between relator and one Baldwin at Omaha, Nebraska. She secured a divorce from him in 1921. After it developed that there had been no such marriage license issued and that no justice of the peace by the name of Flynn ever lived in

Kansas City, relator changed her position and relied upon a claimed common law marriage.

In 1901, while living at Chicago, Illinois, relator left her husband, Wilkinson, by whom she had had one or more children, and has never seen him since. She admitted that she did not know whether he was dead or alive but said that she had been told by someone that he had secured a divorce and was married again. No papers in any divorce proceeding had ever been served upon her, nor had she ever made any effort to ascertain whether he was still alive or whether any divorce had been granted.

1. The findings of the industrial commission must remain undisturbed if there is evidence reasonably tending to sustain them or unless they are manifestly and clearly contrary to the evidence. Such has been the uniform holding of this court. If reasonable minds might reach opposite conclusions after a fair consideration of all the evidence and the proper inferences to be drawn therefrom, then a reasonable conclusion arrived at by the commission must be adhered to. When a question of fact arises, the findings of the commission must be sustained unless a fair consideration of the evidence and the reasonable and fair inferences to be drawn therefrom will require reasonable minds to reach an opposite conclusion. The commission is not necessarily concluded by undisputed testimony, but it must assume as true the positive, unimpeached testimony of credible witnesses unless the same is inherently improbable or rendered so by facts and circumstances disclosed at the hearing. If the testimony of an unimpeached witness is so improbable or contains so many contradictions as to furnish substantial reasons for believing it to be false, such testimony may be disregarded. Babich v. Oliver I. Min. Co. 157 Minn. 122, 124, 195 N. W. 784; Klare v. Peterson, 161 Minn. 16, 200 N. W. 817; Smith v. Mason Bros. Co. 174 Minn. 94, 218 N. W. 243; 1 & 6 Dunnell, Minn. Dig. (2 ed.) §§ 411, 10344a.

2. Under the evidence in this case, the commission might well have found that there was no common law marriage. The testimony of relator being false when she swore she had never been married, the proved fact that no marriage license had been issued

for the claimed Kansas City marriage and that no such magistrate as Flynn ever lived there, as well as other improbable circumstances, more than justified the commission in determining that she was not a credible witness. Not believing her testimony as to these very important and vital·matters, the commission had a right to disbelieve her statement as to a claimed arrangement and agreement made in Omaha in October, 1922, that they should become husband and wife. Her interest in the outcome of the case might also well be considered in weighing her testimony.

Common law marriages were unlawful in Missouri in the year 1922 and have remained so since. To constitute a valid marriage there a license must first be obtained and the marriage must be solemnized by one of certain officials or an ordained preacher of the gospel.

It was stated by a lawyer, expert witness of relator, that a marriage not contracted legally or validly according to the laws of the state in which it was performed or where the contract and agreement was made would not be recognized in Nebraska. However common law marriages were not unlawful in Nebraska in 1922. In relator's brief it is stated that in Nebraska "The three elements necessary to constitute a common law marriage are: 1. An agreement to be husband and wife. 2. A consummation of that agreement by actually living together as husband and wife. 3. Holding each other out to the world as husband and wife." The commission was not obliged to believe that the first essential element existed. LeSuer v. LeSuer, 122 Minn. 407, 142 N. W. 593; Sorensen v. Sorensen, 68 Neb. 483, 94 N. W. 540, 98 N. W. 837, 100 N. W. 930; Hall v. Industrial Comm. 165 Wis. 364, 162 N. W. 312, L. R. A. 1917D, 829.

3. However, there is another ground on which the findings of the commission must be sustained. There is no evidence that the valid first marriage to Wilkinson has been terminated by death or divorce. The burden was on relator to establish that fact. A mere hearing from some unnamed source that Wilkinson had secured a divorce and had married again would not suffice. Under the circumstances, the commission might well decline to believe her statement to that effect. 6 Dunnell, Minn. Dig. (2 ed.) § 10345; Greenfield v. Unique

Theatre Co. 146 Minn. 17, 177 N. W. 666. Nor would the presumption of death, which arises in some instances because of absence for a given number of years, avail under the circumstances here. Wilkinson did not leave her in Chicago for parts unknown. She left him. It does not appear that he knew where she went nor that she ever attempted to learn whether he was dead or alive.

"It is only to the person who leaves his home or place of residence, and is gone more than seven years and not heard of, that this presumption is applicable. Here the wife went away, and the husband, for aught that appears, remained at Lawrence [Massachusetts] or in the vicinity. * * * In the facts stated, we see no sufficient ground for any presumption of the death of the husband upon which the wife * * * could properly have acted." Williams v. Williams, 63 Wis. 58, 67, 23 N. W. 110, 53 Am. R. 253.

Belief, even upon information apparently reliable, that her marriage had been dissolved by divorce or death would not absolve relator from her matrimonial bonds. The permanence of the marriage relation should not depend upon anything so precarious and elusive as the mental state of one of the parties. Reynolds v. State, 58 Neb. 49, 78 N. W. 483. The presumption of death is considered in Goodier v. Mutual Life Ins. Co. 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383; see also Thomas v. Thomas, 16 Neb. 553, 20 N. W. 846; Thomas v. Thomas, 19 Neb. 81, 27 N. W. 84; Parker v. State, 77 Ala. 47, 54 Am. R. 43; Turner v. Williams, 202 Mass. 500, 89 N. E. 110, 24 L.R.A.(N.S.) 1199, 132 A. S. R. 511.

4. A careful examination of all the evidence and an application of the rules above referred to require an affirmance of the order of the commission denying compensation to the relator.

Order affirmed.

WILSON, C. J. (concurring).
I concur in the result.

STONE, J. (concurring).
I concur in the result, my notion being that it is sufficient for decision of the case to confine ourselves to the proposition that the

industrial commission was justified in denying compensation on the ground that the relator's admitted and valid prior marriage to Wilkinson, there being no proof that it had been terminated by death or divorce, was a bar to her alleged common law marriage to Campbell.